## THE GLENFINLAS.[1]

### DAVIS v. A CARGO OF CHALK, Etc.

*(District Court, S. D. New York. April 10, 1890.)*

1. DEMURRAGE—UNLOADING BY LIGHTERS.
    A large vessel, having four hatches, brought a cargo of chalk to the port of New York under a charter-party which contained the following provision: "Cargo to be shipped as fast as vessel can load, and to be discharged as fast as she can deliver." Her draft being considerable, she was first discharged into lighters out of one hatch only. The lighters were in no way improper, they were worked with diligence, and the chalk was received as fast as the ship could properly deliver out of the one hatch that was used. The vessel was not breasted off the wharf, and no demand or offer was made by the ship to breast her off, or to work another lighter on the other side. *Held*, that the vessel could not recover demurrage for this period.

2. SAME—DISCHARGE FROM SINGLE HATCH—USAGE.
    After the vessel was lightened she was sent to a chalk dock, where she could discharge from but one hatch a day. The master complained of this wharf from the first, and claimed that she should have been discharged from at least two hatches simultaneously. Claimant contended that the vessel had discharged 150 tons per day, which was all that the custom of the port required. *Held*, that the clause in the charter providing for the discharge of the vessel "as fast as she can deliver" was not controlled by the alleged custom, but was intended to secure to her a discharge according to her size and means of delivering a chalk cargo in this port, and therefore at a dock reasonably adapted to her means of delivery, if such docks for chalk were reasonably procurable, as in fact they were. The vessel was therefore allowed demurrage for one-half of the working days after commencing at this wharf, assuming that, in discharging at a proper wharf for such a ship from two hatches instead of one, the cargo would have been discharged in half the time.

In Admiralty. Action to recover demurrage.

*Butler, Stillman & Hubbard* and *Mr. Mynderse*, for libelant.

*Robert D. Benedict*, for claimant.

BROWN, J. The libelant claims demurrage for the detention of the ship Glenfinlas in the discharge of a cargo of 3,000 tons of chalk at this port in July, 1889. The cargo was brought under a charter which provided for "delivery along-side to be taken at the merchant's risk and expense;" for "discharge at two safe wharves, as ordered by the consignee;" "cargo to be shipped as fast as vessel can load, and to be discharged as fast as she can deliver;" and "ten days on demurrage over and above the said laying days at fourpence per registered ton per day." Her register was 2,148 tons. The vessel went first to Findley's stores at Atlantic docks, where she could only be discharged into lighters. There two days' delay arose, for which the consignees are liable. The cargo was

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

there partially discharged into several lighters, which were supplied one after another from the 11th to the 19th of July, when the ship was ordered by the consignees to another wharf, as they had a right to do under the charter. During this period the evidence does not show that the lighters sent were improper, or that they were not worked with diligence, or that the chalk was not received as fast as the ship could properly deliver from the one hatch that was used. The evidence indicates that, for the most part at least, additional hatches could not have been worked, because only one lighter at a time could be used on the same side of the ship; and the libelant's testimony states that, in order to work another lighter, it would have been necessary to breast out the ship from the wharf to admit another lighter on the other side of the ship. Her berth was taken by her master; she was not breasted off; there was no demand or offer by the ship to breast off, or to work another lighter, on the other side. She therefore cannot recover demurrage for this period, except for the two days above referred to.

The second wharf to which she was ordered, and which was reached on the night of Saturday, the 20th of July, was Taintor's dock, Newtown creek, one of the principal docks in the city for the delivery of cargoes of chalk from smaller vessels. Discharge there was commenced on Monday morning, and finished on Friday, August 2d. During this time a day was lost through rain. During the other working days the discharge averaged about 160 tons a day. Only one hatch could be worked at that dock, and much evidence on the part of the claimant shows that, according to the usual practice in this port, as respects the delivery of ordinary cargoes of chalk, 150 tons per day is as much as is expected to be received or delivered. The claimants contend that this practice constitutes a usage, which is to be read into the terms of the charter, so as to relieve the consignee from any obligation to receive and provide for more than 150 tons per day. The ship, it is said, could not lawfully deliver more than the consignee was bound to receive; and the agreement "to discharge," it is said, is limited to the amount which the ship had a legal right to deliver under the local usage. I do not think that was the intention of this clause of the charter, or that it can reasonably bear that construction. Its meaning, I think, is to provide expressly for the rate of delivery at such places and during such days an l times as she may be properly worked under the usage of the port. It is the office of usage to supply what is not expressed; not to override the language or the meaning of what is written. Usage in this case would properly determine the working days and hours, because the terms of the charter plainly do not intend to touch that subject. Equally plainly, as it seems to me, it does intend to determine the provision to be made for the ship's rapid discharge during working hours. It would be an obvious breach of the charter stipulation, as it seems to me, for the consignee to refuse to receive any more cargo after 12 o'clock on the ground of local usage, merely because 150 tons had been received during the forenoon; or to refuse to work two hatches instead of one, for the same reason. This vessel was a much larger one, and the cargo much larger, than were usual

in the ordinary transportation of chalk cargoes. She had four hatches. In the discharge of ordinary cargoes, at least two hatches would be used in a vessel of that size. A practice having reference to smaller vessels and smaller cargoes could not reasonably be applied to a much larger one, so as to limit the discharge to a single hatch. The master complained of Taintor's dock as an unsuitable one from the first. The clause in the charter providing for the discharge of the vessel "as fast as she can deliver" must be held intended to secure to her a discharge according to her size and means of delivering a chalk cargo in this port; and, therefore, at a dock reasonably adapted to her means of delivery, if such docks for chalk were reasonably procurable, as in fact they were. Taintor's dock, where a discharge could be made from only one hatch, was not, in my judgment, a proper dock for such a ship, under such a stipulation. The evidence leaves no doubt that other docks were procurable where the cargo could have been discharged from at least two hatches. Had there been any established usage that all chalk cargoes should be discharged at one particular dock, or at certain specified docks only, such a usage, I think, would have attached to this stipulation; and the duty of the consignee would have been only to discharge as fast as the ship could deliver at some one of those docks. But no such usage is shown. The usage claimed is of a kind wholly different, viz., to limit the amount to be received to a certain number of tons per day. Such usage, if proved, would be incompatible with the charter clause, and hence is superseded by it. The evidence, however, shows so much difference in the tons actually discharged per day in various cases, that I do not think any definite usage on that subject is proved to the extent claimed, or anything more than a considerably varying practice, having reference evidently to the general circumstances of the case.

Without attempting, upon the evidence, to determine just how many tons should be discharged per day, I shall, therefore, allow to the consignee only one-half of the working days after commencing at Taintor's dock; assuming that, by discharging at a proper dock for such a ship from two hatches instead of one, the remainder of the cargo would have been discharged in half the time. That would have completed the discharge by Friday night, July 26th. The libelant is therefore entitled to demurrage for the seven days remaining to August 2d, and for the two prior days above referred to, making nine days in all, with interest and costs.